George BALILES, Petitioner,

v.

DISTRICT OF COLUMBIA DEPART-
MENT OF EMPLOYMENT SER-
VICES, Respondent,

Washington Metropolitan Area Transit
Authority, Intervenor.

No. 98–AA–440.

District of Columbia Court of Appeals.

Argued March 25, 1999.

Decided May 6, 1999.

Elizabeth F. Pignatello for petitioner. Mark L. Schaffer, Washington, DC, wrote the brief for petitioner.

Jo Anne Robinson, Principal Deputy Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, filed a statement in lieu of brief for respondent.

Robert C. Baker, Jr., with whom Ann Wittik–Bravmann, Bowie, MD, was on the brief, for intervenor.

Before SCHWELB and REID, Associate Judges, and MACK, Senior Judge.

REID, Associate Judge:

The issue presented in this case is whether petitioner George Baliles, who sought temporary total disability benefits from April 1, 1995 to the present and continuing, voluntarily limited his income within the meaning of D.C.Code § 36–308(3)(V)(iii) (1997) by retir-

ing from his employment position at the Washington Metropolitan Area Transit Authority ("WMATA"). The hearing examiner denied him temporary total disability benefits after April 1, 1995, the date of his retirement, and the Director of the Department of Employment Services ("DOES") affirmed. Finding nothing in the record to support Mr. Baliles' contention that he was forced to retire, we affirm the Director's decision.

## FACTUAL SUMMARY

On November 26, 1993, Mr. Baliles, sustained an injury to his back while working for WMATA as a Fire Compliance Officer. He sought medical attention from Group Health Association. Mr. Baliles returned to work on November 29, 1993, and continued to work until March 1994.

On March 18, 1994, Mr. Baliles initially was unable to get out of bed due to paralyzing back pain. Eventually he made it to work but asked to be taken to the hospital. There he was given pain killers and scheduled for an MRI. The MRI revealed a right sided disc protrusion at L4–5. Mr. Baliles was referred to Dr. James Tozzi for further care. An independent examination was conducted by Dr. Louis Levitt at the request of WMATA. Based upon Dr. Levitt's recommendation, Mr. Baliles enrolled in a "work hardening" program at Ergoworks, a company specializing in physical assessment and rehabilitation. In a letter dated December 13, 1994, Ergoworks advised that:

> [Mr. Baliles] qualifies for the medium to heavy physical demand level. He has met his program goals of improved body mechanics/awareness, increased endurance/cardiovascular fitness .... [He] currently meets the requirements to perform his previous position with ability to monitor his symptoms on his own at work. He is, therefore, discharged from his work hardening program.

On December 19, 1994, Dr. Levitt recommended that Mr. Baliles return to work, with a one month temporary restriction on lifting anything in excess of thirty to fifty pounds. At the conclusion of the month, he stated, Mr. Baliles "can return to full duty without compromise of his work activities." Dr. Levitt added: "At the present time, I do not find a permanent impairment that has resulted from his work trauma." A similar conclusion was reached by Dr. Tozzi when he cleared Mr. Baliles on December 23, 1994 to return to work subject to restrictions against lifting more than thirty pounds and against any climbing.

On January 9, 1995, Mr. Baliles returned to his previous position, which had been modified by WMATA to accommodate his medical restrictions. On or around January 17, 1995, Mr. Baliles was informed orally that his position had been subjected to a reduction in force ("RIF"), effective March 17, 1995.[1] Mr. Baliles decided to retire and to use as much of his sick leave as possible before his actual retirement date. He also wanted to avoid the loss of his life insurance.[2] He went on sick leave beginning January 23, 1995, even though the RIF had not taken place and he was not sick.

On March 2, 1995, Mr. Baliles made a follow-up visit to his treating physician, Dr. Tozzi. After his examination of Mr. Baliles, Dr. Tozzi prepared a report indicating, *inter alia*:

> I do not feel that [Mr. Baliles] is impaired as a result of this condition and, as I have stated previously, I feel that he could be active in a normal capacity, but expect to have an occasional bout of low back pain. I have advised he get a lumbar support. I have advised that he try to stay in shape by continuing flexibility exercises.

Despite Dr. Tozzi's report, Mr. Baliles did not return to work although the RIF did not take place until March 17, 1995. Thus, Mr. Baliles was on sick leave from January 23 to March 17, 1995. The effective date of his retirement was April 1, 1995.[3] At that time

1. Mr. Baliles was informed of the RIF in writing on January 23, 1995.

2. Mr. Baliles also stated that he would have to pay the total cost of his hospitalization insurance after being subjected to the RIF.

3. Mr. Baliles was also informed that if his position became available over the next two years, he would be recalled without having to apply and that WMATA would regularly mail him a list of

he was 59 years old. He began receiving $470.00 per month from WMATA in pension benefits.[4] Because of his seniority, he received an additional three months' salary as severance pay.

After retiring, Mr. Baliles sought temporary total disability benefits from January 23, 1995 to the present and continuing. A hearing was held on September 27, 1995. During his testimony at his hearing, Mr. Baliles was asked whether he had sought work since his RIF. In response, he said he went to the Maryland unemployment compensation office in Greenbelt, Maryland, but "[t]hey have told me that my age and profession, there [are] just not many jobs in that field. I have been in the Fire Service for 37 years." He maintained that he "kept trying Personnel" and "made several trips to Metro to the Personnel Department." When asked the purpose of these trips to the Metro Personnel Department, Mr. Baliles replied:

I don't know if I remember the date—maybe I called them to the exact date. I forgot what the exact date of the RIF was, but I remember—they told me it was March 17. Then I went to see if I was eligible for retirement.

In response to a question from the hearing examiner as to when he checked on his eligibility for retirement, Mr. Baliles answered: "the latter part of January or the first part of February." He did not point to any particular job he sought. Furthermore, he acknowledged that since his retirement, he has spent time at his country property.

The hearing examiner issued a compensation order on August 25, 1997 awarding Mr. Baliles total temporary disability benefits from January 23, 1995 to April 1, 1995, and denying his claim for total temporary disability benefits after April 1, 1995 to the present and continuing. The hearing examiner found that Mr. Baliles' retirement barred continued

wage loss benefits because "his wage loss is no longer a function of his work injury."

Both Mr. Baliles and WMATA filed an application for review with the Director. On March 10, 1998, the Director affirmed the hearing examiner's compensation order, stating *inter alia:*

Claimant insists that employer's failure to pay him temporary total disability benefits and the anticipated loss of other benefits forced him to retire, thus he did not voluntarily limit his income. He seems to insist that he chose retirement instead of receiving nothing, but would not have retired otherwise, except for financial considerations.

[I]n reviewing the instant matter, the Director must stress that the key in this case is that claimant voluntarily limited his income when he chose to retire after being released to return to work by his physician (Employer's exhibit No. 2, March 2, 1995 report). The Director must emphasize that claimant was physically able to work and had no physical limitations placed on him. However, he chose to retire and stop looking for employment, thus, he voluntarily removed himself from the labor market.... Claimant could have sought employment with other employers and even this employer informed him that should another position become available, he might be recalled ....

Based on her review, the Director affirmed the denial of benefits from April 1, 1995 to the present and continuing.[5]

## ANALYSIS

Mr. Baliles "contends that he was forced to retire as [WMATA] made no other employment available to him, coupled with the fact that he would have lost his health and life insurance at age 59 if he did not retire." Thus, he argues, he did not voluntarily limit

---

job vacancies for two years from the date of layoff.

4. Mr. Baliles also receives from the District of Columbia Fire Department $2,400 in pension benefits per month or $30,000 per year.

5. The Director also affirmed the hearing examiner's award of benefits from January 23, 1995 to

April 1, 1995. Although WMATA contested this part of the hearing examiner's compensation order in its application for review before the Director, WMATA did not appeal this aspect of the Director's decision. Thus we do not consider the issue as to whether Mr. Baliles was entitled to benefits from January 23, 1995 to April 1, 1995.

his income, as the agency found. WMATA argues that the Director's decision should be upheld because the evidence in the record shows that Mr. Baliles was able to perform his regular duties as of March 2, 1995, and therefore, he is not entitled to disability benefits. Furthermore, WMATA maintains that by retiring and not looking for work, Mr. Baliles voluntarily limited his income.

 " 'An agency's findings of fact and conclusions of law must be affirmed if they are supported by substantial evidence.' " *Franklin v. District of Columbia Dep't of Employment Servs.*, 709 A.2d 1175, 1176 (D.C.1998) (quoting *District of Columbia v. Davis*, 685 A.2d 389, 393 (D.C.1996)). " 'We will not disturb an agency's decision if it flows rationally from the facts which are supported by substantial evidence in the record.' " *Id.* (quoting *Oubre v. District of Columbia Dep't of Employment Servs.*, 630 A.2d 699, 702 (D.C.1993)).

D.C.Code § 36–308(3)(V)(iii) provides:

If the employee voluntarily limits his or her income or fails to accept employment commensurate with the employee's abilities, the employee's wages after the employee becomes disabled shall be deemed to be the amount the employee would earn if the employee did not voluntarily limit his or her income or did accept employment commensurate with the employee's abilities.

In *Powers v. District of Columbia Dep't of Employment Servs.*, 566 A.2d 1068 (D.C. 1989), we upheld the Director's interpretation of this section and implicitly held, as have courts in other jurisdictions, "that there is no right to compensation benefits when an employee resigns, not for reasons related to the injury or disability, but for economic reasons to take a better job. Otherwise put, any causal link is thereby severed." *Id.* at 1069 (citations omitted). We have never determined whether retirement when a claimant is still able to work constitutes a voluntary limitation of income under § 36–308(3)(V)(iii).

In this case, Mr. Baliles complains that he was forced to retire because WMATA "made no other employment available to him" and he would have lost his life insurance and been required to pay one hundred percent of his hospitalization after he was RIFed. In examining a predecessor version of § 36–308(3)(V)(iii),[6] we recognized the fact that a claimant need not be offered and refuse a specific position under the statute. In reaching our conclusion in *Joyner v. District of Columbia Dep't of Employment Servs.*, 502 A.2d 1027 (D.C.1986), we noted the Director's concern that a requirement of a specific job offer by the employer "would invite at least some claimants to adopt a passive, or even negative, attitude about pursuing re-employment." *Id.* at 1031. We said: "There might be no specific offer if the claimant failed to take the steps usually necessary to procure offers (*e.g.*, investigating job opportunities, circulating resumes, interviewing, etc.)." *Id.*

Mr. Baliles was employed and not disabled when he assumed sick leave status approximately two months before he retired. He was not terminated at that point nor subjected to a RIF. Moreover, the record is devoid of any evidence that he took steps to obtain other job offers. There is a reference in his testimony to visits to Metro Personnel, but they apparently were made to determine his eligibility for retirement. In addition, when he spent time at his country property, there is no evidence that he was seeking employment in that area. Even after Dr. Tozzi reported his view that Mr. Baliles was not "impaired" and "could be active in a normal capacity," Mr. Baliles continued in a sick leave status. He voluntarily limited his income by continuing in sick leave status when he was able to work, and by deciding to retire after the RIF even though he was able to work and had been informed in writing that he would be placed on a recall list and sent a list of all job vacancies.

We see nothing in the record before us to support Mr. Baliles' contention that he was forced to retire. There is no evidence that the RIF was a ploy designed to get rid of Mr. Baliles by forcing his retirement, or that WMATA had no intention of sending him a list of all job vacancies. Nor is there any indication that WMATA would refuse to re-

**6.** D.C.Code § 36–308(c) (1981) was virtually identical to § 36–308(3)(V)(iii).

call Mr. Baliles if his position became available again within two years. Furthermore, nothing in the record suggests that Mr. Baliles' retirement was related to his work injury. Indeed, as early as December 1994, a company specializing in physical assessment and rehabilitation concluded that Mr. Baliles "qualifie[d] for the medium to heavy physical demand level" of his job and that he "currently meets the requirements to perform his previous position with ability to monitor his symptoms on his own at work." In December 1994, Dr. Levitt recommended that he return to work with a temporary one month restriction on lifting anything in excess of thirty to fifty pounds, and Dr. Tozzi reported his opinion, in March 1995, that Mr. Baliles was not "impaired as a result of [his] condition" and that "he could be active in a normal capacity, but expect to have an occasional bout of low back pain."

We are satisfied that the agency's findings of fact and conclusions of law are supported by substantial evidence in the record, and that the Director's decision flows rationally from the evidence. Moreover, we are mindful that: "The agency's interpretation of the statute it administers is binding on this court unless it conflicts with the plain meaning of the statute or its legislative history." *Smith v. District of Columbia Dep't of Employment Servs.*, 548 A.2d 95, 97 (D.C. 1988). "[W]e sustain the agency decision even in cases in which other, contrary, constructions may be equally as reasonable as the one adopted by the agency." *Hively v. District of Columbia Dep't of Employment Servs.*, 681 A.2d 1158, 1160–61 (D.C.1996).

On this record, the Director's interpretation of § 36–308(3)(V)(iii) is reasonable and consistent with the workers' compensation statute. The record shows that Mr. Baliles was cleared by his treating physician to return to his normal job duties before he retired and that his retirement, rather than being coerced, is traceable to his own economic decisions pertaining to his sick leave, health, and life insurance benefits. Accordingly, we see no reason to disturb the Director's conclusion that Mr. Baliles was not entitled to disability benefits after April 1, 1995 because he voluntarily limited his in-come when he retired and his retirement was not related to his work injury. *See* D.C.Code § 36–308(3)(V)(iii); *Franklin, supra; Powers, supra;* and *Joyner, supra*.

For the foregoing reasons, we affirm the decision of the Director.

*So ordered.*