**Ouida P. MORRISON, Petitioner,**

v.

**DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES, Respondent.**

**Greater Southeast Community Hospital, Intervenor.**

**No. 98–AA–1597.**

District of Columbia Court of Appeals.

Argued Sept. 17, 2003.
Decided Nov. 6, 2003.

W. Scott Funger for petitioner.

Donald P. Maiberger for intervenor.

Jo Anne Robinson, Interim Corporation Counsel at the time the statement was filed, and Charles L. Reischel, Deputy Corporation Counsel at the time the statement was filed, filed a statement in lieu of brief for respondent.

Before STEADMAN and REID, Associate Judges, and PRYOR, Senior Judge.

REID, Associate Judge:

Petitioner Ouida P. Morrison petitions for review of a decision of the Director of the District of Columbia Department of Employment Services ("the Director of DOES" or "the Director") affirming the 1998 compensation order of the hearings and appeals examiner ("hearing examiner") which reduced her weekly disability benefits. She began to receive disability benefits after being injured while performing nursing duties at the Greater Southeast Community Hospital ("GSECH"). The hearing examiner in essence approved GSECH's reduction of Ms. Morrison's disability benefits after concluding that she did not accept a job offered to her by another health facility which was commen-surate with her physical abilities. Ms. Morrison filed a timely petition for review of the DOES decision.[1] She contends that the job offered to her was not commensurate with her physical limitations, and further, that it was not suitable because she would have been compelled to give up her part-time position. We conclude that the agency's decision that Ms. Morrison rejected a job offer commensurate with her physical abilities is based on substantial record evidence. However, because the Director of DOES did not address squarely the second argument presented to him—that the position offered was not suitable because it would have compelled Ms. Morrison to give up her part-time position—we are constrained to remand the case to the agency for consideration of that issue.

## FACTUAL SUMMARY

Before the compensation hearing on Ms. Morrison's workers' compensation claim, the parties stipulated that: "On December 7, 1994, [Ms. Morrison] suffered a traumatic injury and/or aggravation or exacerbation of an existing injury to her back and neck arising out of and in the course of her employment with self-insured employer, [GSECH]." The stipulation further specified that at the time of her injury, Ms. Morrison "had an average weekly wage from [GSECH] of $943.29 with a corresponding compensation rate of $628.86." In addition, Ms. Morrison held a part-time position with Jackson Medical Group and received "an average weekly wage ... of $272.98 with a corresponding compensation rate of $181.98." As a result of her part-time position, the stipulation recognized that Ms. Morrison "had a

---

1. Ms. Morrison's appeal was stayed for a period of time due to GSECH's bankruptcy proceeding.

stacked average weekly wage of $1,216.27 with a corresponding compensation rate of $679.17"; and that she "is entitled to temporary partial disability ... benefits for the period of August 24, 1995 to the present and continuing...."

Based upon Ms. Morrison's temporary partial disability, and the continuation of her part-time employment with the Jackson Medical Group, GSECH agreed to make a lump sum payment, and "the amount of $628.86 every week beginning on July 1, 1996 and continuing during the period that [Ms. Morrison] participates in a program of vocational rehabilitation and/or job placement...." In June 1997, however, GSECH reduced Ms. Morrison's $628.86 weekly benefit to $539.76. As a result of Ms. Morrison's challenge to the reduction, a formal hearing was held on January 27, 1998.

The hearing examiner found that GSECH reduced Ms. Morrison's weekly disability benefit because of her "refusal to accept suitable employment at St. Anne's [Infant and Maternity Home] ["St. Anne's"]." GSECH had "provided [Ms. Morrison] with vocational rehabilitation services from September 17, 1996 to August 6, 1997." These services resulted in an offer of two jobs to Ms. Morrison in March and April 1997, respectively, one with St. Anne's and the other with Kaiser Permanente. The hearing examiner determined that Ms. Morrison

declined the position at St. Anne's because the tour of duty interfered with her part-time employment at the Jackson Medical Group, the salary offered did not equal her pre-injury stacked wage, and [she] was required to be on-call every other weekend, i.e., to be

available by telephone to employees then on duty.

In addition, the hearing examiner concluded that Ms. Morrison accepted the Kaiser Permanente job even though she knew "that she lacked the typing and computer skills required therefor .... [and had] indicated on her resume that she had computer training." [2] Despite "a typing tutorial provided by Kaiser[,]" Ms. Morrison failed "the orientation program" and was terminated by Kaiser Permanente. Her own efforts to find other suitable employment were unsuccessful.

Ms. Morrison filed an application for review of the hearing examiner's decision with the Director of DOES. She made two arguments in her application for review: (1) "The job at St. Anne's Maternity Home was not suitable employment because it did not conform with claimant's physical limitations"; and (2) "The job at St. Anne's Maternity Home was not suitable employment because claimant already had an acceptable job which she would have had to quit to take the job at St. Anne's Maternity Home." The Director declared in part:

The claimant argues on appeal that she declined the job at St. Anne's because the physical requirements of the job were greater than her medical restrictions. After a careful review of the record, the Director states that the [h]earing [e]xaminer's findings, in this case, are supported by substantial evidence.

Based on the compensation hearing testimony of Ms. Morrison, as well as that of Donna Polk, prenatal supervisor at St. Anne's, and Samantha Kieley, an expert in vocational rehabilitation who testified on

2. Ms. Morrison held "a Bachelor of Science degree in nursing, an Associate of Arts degree in Mathematics and Science, certificates in nursing and nurse-midwifery, and nursing li-

censes in the District of Columbia, Maryland, and New York, and employment in the field of nursing since 1964."

behalf of GSECH, the Director of DOES concluded that "there is substantial evidence in the record to support the [h]earing [e]xaminer's conclusion that [Ms. Morrison] voluntarily limited her income."

The compensation hearing transcript of January 27, 1998, and other record documents contain information relevant to the Director's conclusion. During the compensation hearing, the following exchange took place between counsel for GSECH and Ms. Polk:

Q. Did you discuss with [Ms. Morrison] the physical ramifications of the job?

A. There were really no physical ramifications, other than basic work.

Q. Did [Ms. Morrison] indicate to you at any time during the course of the interview that she had any physical limitations or restrictions that prevented her from doing the job?

A. During the interview [for the position at St. Anne's], she had made reference to the weight lifting constraints that she had.

Q. And what was that?

A. I don't recall the actual weight.

Q. Do you have any record of the actual weight?

A. No, we don't.

Q. Based upon your discussion with [Ms. Morrison], did that weight limitation restrict her for the job of an assistant nursing supervisor at St. Anne's?

A. I wouldn't foresee it as being a problem.

Ms. Polk further testified that Ms. Morrison was offered the position at a salary of $28,000 but refused it "[d]ue to ... [t]he money." She would work a five-day week, 8:00 a.m. to 4:00 p.m., except on Wednesdays when her hours would be 12:00 to 8:00 p.m., and would be "on call [e]very other weekend." Generally, weekend duty could be accomplished from the home "unless the situation called for [Ms. Morrison] to come in." On cross-examination, Ms. Polk was asked whether Ms. Morrison's job would involve "turning [patients] over when they need medication or something like that?" She replied: "Since I've been there, I've never seen that.... Nursing care could imply that you would have to help someone roll over, I'm not sure." In response to the question whether in an emergency the job would involve "helping somebody up off the floor or preventing them from falling or picking them up in bed or something like that," Ms. Polk eventually responded: "Yes, if it's needed to take care of a resident."

The following exchange took place between GSECH's counsel and Ms. Kieley regarding Ms. Morrison's physical limitations:

Q. [W]ere you aware of the physical restrictions under which [Ms. Morrison] was operating?

A. Not specifically, only that she felt that the position was physically appropriate.

Q. Were you aware of the physical restrictions that were authored by Dr. McLaren at that time?

A. Yes.

Ms. Kieley acknowledged her awareness of a communication from Dr. McLaren, Ms. Morrison's physician who treated her for pain, specifying limitations on the use of force "to lift, carry, push, pull, or otherwise move objects...."[3] GSECH's

---

**3.** The October 21, 1996 communication from Dr. McLaren responded to a questionnaire sent to him by Ms. Kieley "concerning limitations imposed by [Ms. Morrison's] present medical condition." Dr. McLaren specified "up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly." Dr.

counsel asked Ms. Kieley whether in her professional "opinion as a vocational rehabilitation counselor" the position offered to Ms. Morrison at St. Anne's was "appropriate." She replied:

> Based upon Ms. Morrison's description of the outcome of her interview and what she learned from talking with the employer, it appeared that the position was physically appropriate. I assumed that she had discussed with the employer what the job required.
>
> And my answer to your question is, yes, I do feel that it was an appropriate position, based upon several factors. Number one, it was within her field of specialty, Ob–Gyn nursing. Second of all, it was a position that she was qualified for, based upon her skills and the outcome of her interview. Also, the position happened to be very .close geographically to where she resides, and given the length of job search that had ensued prior to that time, when this position had been offered, I thought that it was appropriate.

On cross-examination, Ms. Kieley was asked whether she knew that a requirement of the St. Anne's job offered to Ms. Morrison "involved patient care, and that patient care would involve moving patients, helping them if anyone were falling, picking them up if they were falling ...." She answered: "No, I did not." But, Ms. Kieley confirmed that she had "met with Ms. Morrison and Dr. McLaren to discuss [Ms. Morrison's] physical limitations." However, she did not discuss the physical duties concerning the St. Anne's position with Dr. McLaren.

In discussing the Kaiser Permanente position, which was the second job offer made to Ms. Morrison as a result of the efforts of GSECH's vocational rehabilitation counselor, Ms. Kieley indicated that she had "learned ... early on when [she and Ms. Morrison] began working together," that Ms. Morrison had "a deficiency in typing." She also confirmed that Ms. Morrison told her "that she had bad typing and computer skills," and that she was aware of Ms. Morrison's "lack of case management and utilization review skills."

During her compensation hearing testimony, Ms. Morrison was asked why she turned down the St. Anne's job offer. She stated:

> I told [St. Anne's] it was too strenuous, and the benefits were far too low. I was only going to have one week vacation, no sick time, the 24 hour availability was too strenuous for me to handle, and the salary, and I would have to give up my job at Jackson Medical Group to go there.

McLaren's deposition of January 20, 1998, reveals that Ms. Morrison visited his office in March 1997, the month in which she was offered the St. Anne's position. She complained of "recurring pains in the lower back," and his "[e]xamination of [her] spine showed there was some painful limitation in extension and flexion and some tenderness, facet tenderness." Dr. McLaren performed a nerve block on her on March 14, 1997. He again saw Ms. McLaren on July 3, 1997, when "she complained of excruciating pain." She was diagnosed with "exacerbation of lumbar facet syndrome...." Dr. McLaren recommended another nerve block. On July 10, 1997, Ms. Morrison returned to Dr. McLaren's office. "She complained of pain in her back with radiation down her right buttock, right leg, and of the spine.... She was unable to move her lumbar spine because of the pain...." He prescribed a set of nerve blocks. Dr. McLaren specified the following restrictions on Ms. Morrison's actions: "Sitting and standing not more than two hours at a time, no driving for more than 30 miles a day, no lifting of more than five to ten pounds, patient to work four hours a day, unable to tolerate eight hours a day." However, when Dr. McLaren saw Ms. Morrison on September 23, 1997, he noted that "she display[ed] a full functional range of motion in all arcs of movement."

She described St. Anne's "on call" requirement:

> I had to be available on a 24 hour on call basis, 24 hour availability to do staffing. I had to carry a pager at all times. I was also informed that if staff was low and nobody showed up, then I would have to fill in for that person who had called in, if there was nobody available to fill that slot. And there were days that I would have to go to the hospital with the clients, and I would also be required to drive the van that takes the clients to the hospital.

At the time of her testimony, Ms. Morrison was working at the Jackson Medical Group on Mondays for four hours and Fridays for eight hours. Her duties included "advising the patients," performing a "triage [of] the patients who have emergency problems[,] manag[ing] the low-risk OB patients and GYN patients and family planning patients, ... assist[ing] the nursing assistant with supervising her with medications and weights, blood pressures, patient assessment and things of that nature." Ms. Morrison further explained her concerns about the twenty-four hour availability requirement during the following exchange on cross-examination:

> Q. And the work schedule was daytime on Monday, Tuesday, Thursday and Friday?
>
> A. No.
>
> Q. It was not?
>
> A. I was told it was Monday through the weekend, that I would be on call every other weekend, and Monday through Friday from 8:30 or 8:00 o'clock we began work. I wasn't given a specific time ....
>
> Q. Excuse me. You were never told that once you left that employment after your shift ended that you were on call, true?

> A. I was told I would be on call .... I was told I would be given a pager, and I would be notified whenever there was a need for me to come in, and I would be on call 24 hours.

Ms. Polk's testimony did not mention weekday on call duties. And, she denied that Ms. Morrison was provided with a beeper or a cell phone.

On cross-examination, counsel for GSECH inquired as to why Ms. Morrison had not informed St. Anne's of her physical restrictions; the following colloquy took place in response:

> A. Because when I examined the job description[ ] or what was put to me... [as] the requirements of the job, I felt they were within what I would be able to handle.
>
> Q. So your testimony here today is that the job at St. Anne['s], based upon your understanding of the restrictions, was within those restrictions?
>
> A. After I interviewed, I found out that it would not be because of the 24 hour availability.

She was also posed the following question: "So the only reason that you felt that the St. Ann[e's] job was inappropriate within your physical restrictions was that you concluded that the 24 hour on call was inappropriate to you for your physical restrictions; is that correct?" She answered, "Yes." Ms. Morrison further acknowledged that she had "had the full mobility of [her] spine since September 1997[,]" and that she had "heard [Dr. McLaren] testify [at his deposition] that his physical restrictions [for Ms. Morrison] are as he stated them in his note of October 21, 1996."

## ANALYSIS

■ In essence, Ms. Morrison first contends that the record does not contain substantial evidence to support DOES' de-

cision that she rejected a position commensurate with her physical abilities. She claims that DOES' "characterization of [her] testimony ... is not accurate"; and that "[t]here is ... no competent testimony to support the finding of the [h]earing [e]xaminer 'that the duties of the full time position by St. Anne's as a nurse supervisor did not require [her] to perform any physical activities which she had been medically restricted from performing."' Second, she maintains that the "the full time job at [St. Anne's] did not constitute suitable gainful employment because the salary of $28,000.00 per year there was insufficient" since she "would have been required to quit her part time employment with the Jacks on Medical Group ...." GSECH argues that there is substantial evidence in the record to support DOES' decision, as well as the compensation order of the hearing examiner. Furthermore, GSECH insists that "finding a position that matched the salary of a claimant prior to the injury is not the responsibility of the employer...."

At the outset of our analysis, we reiterate the applicable standard of review. "An agency's findings of fact and conclusions of law must be affirmed if they are supported by substantial evidence." *Baliles v. District of Columbia Dep't of Employment Servs.*, 728 A.2d 661, 664 (D.C.1999) (quoting *Franklin v. District of Columbia Dep't of Employment Servs.*, 709 A.2d 1175, 1176 (D.C.1998)) (other citation and internal quotation marks omitted). "We will not disturb an agency's decision if it flows rationally from the facts which are supported by substantial evidence in the record." *Id.* (quoting *Franklin, supra,* 709 A.2d at 1176) (other citation and internal quotation marks omitted). "Substantial evidence 'is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Harris v. District of Columbia Dep't of Employment*

*Servs.*, 746 A.2d 297, 302 (D.C.2000) (quoting *Ferreira v. District of Columbia Dep't of Employment Servs.*, 667 A.2d 310, 312 (D.C.1995)) (other citations omitted).

In addition, "[a]n agency as a finder of fact, may credit the evidence upon which it relies to the detriment of conflicting evidence, and [generally] need not explain why it favored the evidence of one side or the other." *Metropolitan Poultry and Liberty Mut. Ins. Co. v. District of Columbia Dep't of Employment Servs.*, 706 A.2d 33, 35 (D.C.1998) (quoting *McKinley v. District of Columbia Dep't of Employment Servs.*, 696 A.2d 1377, 1386 (D.C.1997)). Moreover, the agency's interpretation of its statute is "controlling unless it is plainly erroneous or inconsistent with the statute." *DeShazo v. District of Columbia Dep't of Employment Servs.*, 638 A.2d 1152, 1154 (D.C.1994) (citation and internal quotation marks omitted). Despite this deferential standard of review, where "the agency's analysis and justification of its position are insufficiently clear to permit an affirmance on [the] record," we will remand the matter to the agency for clarification. *Id.*

With respect to the concept of "job availability," we have said:

Job availability should incorporate the answer to two questions. (1) Considering claimant's age, background, etc., what can the claimant physically and mentally do following his [or her] injury, that is, what type of jobs is he [or she] capable of performing or capable of being trained to do? (2) Within this category of jobs that the claimant is reasonably capable of performing, are there jobs reasonably available in the community for which the claimant is able to compete and which he [or she] could realistically and likely secure?

*Joyner v. District of Columbia Dep't of Employment Servs.*, 502 A.2d 1027, 1031 n. 4 (D.C.1986). At the time of Ms. Morrison's injury, D.C.Code § 36–308(V)(iii) (1997) provided:

> If the employee voluntarily limits his or her income or fails to accept employment commensurate with the employee's abilities, the employee's wages after the employee becomes disabled shall be deemed to be the amount the employee would earn if the employee did not voluntarily limit his or her income or did accept employment commensurate with the employee's abilities.

And, § 36–308(5) specified in pertinent part:

> In the case of temporary partial liability, ... [w]age loss shall be the difference between the employee's average weekly wage before becoming disabled and the employee's actual wages after becoming disabled. If the employee voluntarily limits his [or her] income or fails to accept employment commensurate with his [or her] abilities, then his [or her] wages after becoming disabled shall be deemed to be the amount he [or she] would earn if he [or she] did not voluntarily limit his [or her] income or did accept employment commensurate with his [or her] abilities.

Here, the first question is whether Ms. Morrison rejected employment commensurate with her physical abilities. The Director of DOES determined that there was substantial evidence in the record to sustain the hearing examiner's finding—that Ms. Morrison "failed to accept employment commensurate with her physical restrictions when she rejected the employment offer extended to her by St. Anne's." Our review of the record constrains us to agree with the Director.

GSECH provided Ms. Morrison with vocational rehabilitation counseling, for approximately nine months. The vocational rehabilitation services resulted in an offer of employment at St. Anne's for which Ms. Morrison was qualified, as well as an offer at Kaiser Permanente for which she was not qualified due to her lack of typing and computer skills. Ms. Morrison stated several reasons for rejecting the position at St. Anne's, only one of which remotely related to her physical capabilities. In her words, the job was viewed as "too strenuous." This conclusion was based on her inaccurate belief that the twenty-four hour on call requirement extended beyond "every other week." Indeed she testified that "when [she] examined the job description[ ] or what was put to [her] ... as the requirements of the job, [she] felt they were within what [she] could handle." And significantly, she stated that she had "had the full mobility of [her] spine since September 1997."

Ms. Polk, the prenatal supervisor at St. Anne's, clearly testified that the on call duty would be "[e]very other weekend," and that this duty could be performed at Ms. Morrison's home "unless the situation called for [her] to come in." She did not "foresee" the weight lifting limitations imposed on Ms. Morrison "as being a problem." In response to the question whether Ms. Morrison would be required to "turn[ ] [patients] over when they needed medication or something like that," Ms. Polk said she had never seen that happen since she began her duties at St. Anne's. After being pressed concerning the possibility of having to "help[ ] somebody up off the floor or preventing them from falling or picking them up" in an emergency, Ms. Polk asserted that that could happen "if it's needed to take care of a resident." Furthermore, Ms. Kieley, who was aware of Dr. McLaren's physical restrictions, considered the St. Anne's position to be "physically appropriate" based upon Ms. Morrison's description of what the position entailed. And, although Dr. McLaren not-

ed problems with Ms. Morrison's back from March 1997 to July 1997, his deposition testimony of January 20, 1998, indicated that as of September 1997, Ms. Morrison "display[ed] a full functional range of motion in all arcs of movement."

The cited testimony from Ms. Polk, Ms. Kieley, Ms. Morrison herself, and Dr. McLaren as to the physical requirements of the St. Anne's position, and Ms. Morrison's physical abilities, discounts Ms. Morrison's assertion that the position was "too strenuous" for her. Moreover, the other reasons listed by Ms. Morrison appeared to be the major ones for her rejection of the St. Anne's position: "the benefits were far too low"; "I was only going to have one week vacation, no sick time, ... and the salary, and I would have to give up my job at Jackson Medical Group to go there."

Even if the record is viewed as containing conflicting evidence regarding Ms. Morrison's physical abilities and her capacity to handle the position at St. Anne's, the hearing examiner, as the finder of fact, "may credit the evidence upon which [he] relie[d] to the detriment of conflicting evidence, and [generally] need not explain why [he] favored the evidence of one side or the other." *Metropolitan Poultry and Liberty Mut. Ins. Co., supra,* 706 A.2d at 35 (quoting *McKinley, supra,* 696 A.2d at 1386). In short, in response to Ms. Morrison's first contention, the record reveals "such relevant evidence as a reasonable mind might accept as adequate to support [the] conclusion" that she failed to accept employment commensurate with her abilities. *Harris, supra,* 746 A.2d at 302.

 Ms. Morrison's second main argument is, in her words,. that "[t]he job at St. Anne's Maternity Home was not suitable employment because claimant already had an acceptable job which she would have had to quit to take the job at St. Anne's Maternity Home." She points out that her annual salary at St. Anne's of $28,000 "was insufficient compared to [her] $12,844.00 per year of part time pre injury wage at the Jackson Medical Group." Although this issue, framed in precisely the same words and with several pages of accompanying discussion, was squarely presented to the Director by Ms. Morrison in her application for review, it was simply not expressly addressed in the decision of the Director. Where an agency fails to address an issue presented to it, we generally "remand the case to [the Director] for a determination." *Branson v. District of Columbia Dep't of Employment Servs.,* 801 A.2d 975, 979 (D.C.2002). And we have stated often that: "Ordinarily ... 'this court will not attempt to interpret the agency's statute until the agency itself has done so.' Instead, we will remand to permit the agency to engage in the necessary analysis of the legislation it is charged with carrying out." *King v. District of Columbia Dep't of Employment Servs.,* 742 A.2d 460, 466 (D.C.1999) (quoting *Wahlne v. District of Columbia Dep't of Employment Servs.,* 704 A.2d 1196, 1199 (D.C.1997)). Consequently, we are constrained to remand Ms. Morrison's second issue to the agency for consideration and decision.

Accordingly, for the foregoing reasons, we conclude that the agency's decision that Ms. Morrison rejected a job offer commensurate with her physical abilities is based on substantial record evidence, but we remand the case to the agency for a determination of whether Ms. Morrison was entitled to refuse the job offer at St. Anne's because it was not "suitable employment," even though it was commensurate with her physical abilities, since she would be forced to give up her position at the Jackson Medical Group.

*So ordered.*